**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| RUTH AREIAS, individually and on behalf of all others similarly situated, | Civil Action No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| FCA US LLC, | |
| Defendant. | |

Plaintiff Ruth Areias ("Plaintiff") brings this action individually and on behalf of all others similarly situated against Defendant FCA US LLC ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## FACTS COMMON TO ALL CAUSES OF ACTION

1.     This is a putative class action against FCA US, LLC ("FCA"), brought by Plaintiff on behalf of herself and all others similarly situated, nationwide and in California.

2.     This case involves all 2014-2020 Jeep Cherokee cars equipped with an Electronic Parking Brake ("EPB") and sold in the United States (the "Class Vehicles"). Approximately 1.3 million cars are affected.

3.     The relevant time period includes all years that FCA manufactured, marketed, and distributed the Class Vehicles.

4.     At issue in this case is a defect in the Class Vehicles that allows water to leak into the Class Vehicles causing the Electronic Parking Brake module to corrode or otherwise fail such that the EPB will inadvertently activate and stop the vehicle while in motion or cause the rear

wheels to lock up (the "Unintended Braking Defect").

5.     The National Highway Traffic Safety Administration ("NHTSA") has received 80 complaints for the Class Vehicles alleging that the EPB inadvertently activates while the vehicle is in motion.  One example of a consumer complaint reads as follows: "While driving on a four-lane highway at 65 mph the vehicle partially lost power and would not accelerate, upshift, or downshift, the brake lights started flashing, along with many other lights on the dash including check engine."  The owner reported being shown the parking brake module of the car by a mechanic and informed that water had seeped into the system, leaving the electronic parking brake module corroded.

6.     Random, unintended braking is a safety hazard.  For example, it increases the risk of a rear-end collision.

7.     Reasonable consumers would want to know about the existence of the Unintended Braking Defect, and would consider the existence of the defect to be a material factor when deciding whether to purchase a Class Vehicle.

8.     FCA knew about the defect well before the Class Vehicles' launch, and in no event later than May 2016, from multiple sources.  These sources include pre-release testing data, early consumer complaints about the Unintended Braking Defect to FCA directly and its dealers, testing and investigations conducted in response to these complaints, replacement parts sales data, aggregate data about the Unintended Braking Defect from FCA's dealers, including high number of warranty reimbursement claims (contained in FCA's warranty database), and from other internal sources that are only accessible to FCA.  These sources also include consumer complaints collected by the NHTSA.

9.     FCA knew of the Unintended Braking Defect based on requests for warranty

service made to FCA's authorized dealers detailing the same problems suffered by the Plaintiff. FCA also maintains detailed records of the complaints about the Unintended Braking Defect, the affected car model/years and VINs, and the work performed on the cars in an attempt to correct the problem.  It is standard industry practice for car companies to track warranty claims for trends, which would have provided FCA with the ability to mine data for information about its cars and the nature of repair claims.  Consequently, FCA should have been aware of the large number of similar, repeat complaints received regarding the Unintended Braking Defect and the failure of repairs to remedy that defect.

10.     Since 2014 at the latest, FCA has constantly tracked the NHTSA database to track reports concerning problems with its vehicles, including problems with braking systems, because they are a critical safety feature.  From this source, FCA knew that the Class Vehicles were experiencing unusually high levels of problems with the EPB.

11.     Defendant would have monitored and been aware of complaints to NHTSA because Federal law requires automakers to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data.

12.     Automakers also have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements.  Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects.

13.     FCA also monitors NHTSA complaints, knowing that it is often the case that for every person who complains about a defect, there are many other people who experienced the

same defect but who do not complain to NHTSA.  Thus, monitoring NHTSA complaints can serve as an early warning system for car defects.

14.     FCA also knew or should have known about the Unintended Braking Defect because of the similarity of complaints.  The fact that so many customers made similar complaints indicates that the complaints were not the result of user error or anomalous incidents, but instead a systemic problem with the Class Vehicles.  Here, the reports and complaints from consumers were similar enough to put Defendant on notice that the incidents described were the result of a defect, and that the Class Vehicles were experiencing unusually high levels of complaints about the EPB.

15.     On August 3, 2015, FCA issued Recall No. 15V-393, which addressed water ingress affecting the power liftgate module on the Class Vehicles:

---

**Description of Defect :**

Description of the Defect : Some 2014-2015 MY Jeep Cherokee vehicles equipped with the Power Liftgate option may experience corrosion induced high resistance short circuit due to liquid intrusion into the Power Liftgate Control Module.

FMVSS 1 : NR

FMVSS 2 : NR

Description of the Safety Risk : This defect may, in some cases, result in a fire.

Description of the Cause : NR

Identification of Any Warning that can Occur : NR

---

The recall is relevant to FCA's pre-sale knowledge because the liftgate and EPB modules are located closely together in a similar area of the Class Vehicles.  Hence, FCA knew that the EPB was prone to water exposure.  As the designer and installer of the EBP, FCA also knew that the EPB was not designed to be exposed to water and could malfunction if exposed to water.

16.     On May 11, 2016, FCA released a Technical Service Bulletin ("TSB") that instructed dealers on replacing the EPB module and inspecting the electrical connector for water corrosion if a customer describes having problems with the EFB:



**NUMBER:** 08-060-16

**GROUP:** Electrical

**DATE:** May 11, 2016

This bulletin is supplied as technical information only and is not an authorization for repair. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, or otherwise, without written permission of FCA US LLC.

**SUBJECT:**
Electronic Parking Brake Module Connector Water Intrusion

**OVERVIEW:**
This bulletin involves inspecting the parking brake module wiring harness connection for terminal corrosion and if needed, replacing the connector.

**MODELS:**

| | | |
|---|---|---|
| 2014 - 2016 | (KL) | Jeep Cherokee |

17.     Obviously, these TSBs did not materialize out of thin air on the dates that the TSBs were issued.  Each TSB would have required an extensive root cause analysis and time spent developing potential solutions to the problems, including causes of corrosion such as water intrusion.  Accordingly, the TSB is evidence that, more likely than not, FCA knew about the Unintended Braking Defect at least 6-12 months before the TSB was issued, if not sooner.

18.     FCA failed to disclose the Unintended Braking Defect to customers.  No information about the defect was disclosed on window stickers, in owner's manuals, in print brochures, on FCA's website, or any other source where prospective customers would likely go to get information about the Class Vehicles.

19.     Knowledge and information regarding the Unintended Braking Defect was in the exclusive and superior possession of FCA and its network of authorized dealers.

20.     FCA had and has a duty to fully disclose the true nature of the Unintended Braking Defect and the associated repair costs to Class Vehicle owners, among other reasons, because the defect poses an unreasonable safety hazard; because FCA had and has exclusive

knowledge or access to material facts about the Class Vehicles' EPB and because FCA actively concealed the defect from Class members.

21.     FCA also had a duty to disclose the Unintended Braking Defect because it made partial disclosures in its user manuals about how to use the EPB system, without disclosing the risks posed by the Unintended Braking Defect due to water intrusion.

22.     For instance, Defendant marketed the EPB as a safety feature in their brochures.



23.     Furthermore, Defendant warranted in the owner's manual that the Class Vehicles were capable of driving through standing water up to 16 inches deep without disclosing the risks posed by the Unintended Braking Defect:

**Flowing Water**

If the water is swift flowing and rising (as in storm run-off) avoid crossing until the water level recedes and/or the flow rate is reduced. If you must cross flowing-water, avoid depths in excess of 9 inches (22 cm). The flowing water can erode the streambed causing your vehicle to sink into deeper water. Determine exit point(s) that are down-stream of your entry point to allow for drifting.

**Standing Water**

Avoid driving in standing water deeper than 16 inches (40.5 cm), and reduce speed appropriately to minimize wave effects. Maximum speed in 16 inches (40.5 cm) of water is less than 5 mph (8 km/h).

(Trailhawk only): Avoid driving in standing water deeper than 19 inches (48 cm), and reduce speed appropriately to minimize wave effects. Maximum speed in 19 inches (48 cm) of water is less than 5 mph (8 km/h).

24.     Accordingly, Plaintiff brings her claims against Defendant individually and on behalf of a class of all others similarly situated for: (1) breach of express warranty under U.C.C. 2-313; (2) breach of implied warranty of merchantability under U.C.C. 2-314; (3) unjust enrichment; (4) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (5) violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.; (6) breach of the Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792, *et seq*.; and California Commercial Code § 2314; (7) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, *et seq*.

## PARTIES

25.     Plaintiff Ruth Areias is domiciled in Tranquility, California.

26.     Plaintiff owns a 2019 Jeep Cherokee, which she purchased new for personal or household use in May 2019 from an authorized dealer in Selma, California.

27.     Prior to her purchase, Plaintiff reviewed and relied on the window sticker and discussions with salespeople.  None of the sources of information Plaintiff reviewed disclosed the Electronic Parking Brake (EPB) system defect.  If there had been such a disclosure, Plaintiff would not have bought her Class Vehicle, or would have paid less for it.

28.     Plaintiff experienced the defect on numerous occasions. Plaintiff first experienced the defect in January 2020 while attempting to take off from a stationary position.  The EPB system inadvertently activated, and Plaintiff had to make several attempts to disengage the EPB system before it released.  Most recently, in August 2022, Plaintiff experienced the defect near the United States Postal Service office in Tranquility, California.  While Plaintiff was attempting to drive from a stationary position the EPB system inadvertently activated, and Plaintiff had to make several attempts to disengage the EPB system before it released.

29.     Defendant FCA US LLC ("FCA") is a limited liability company organized and existing under the laws of the State of Delaware.  FCA's principal place of business and headquarters is in Auburn Hills, Michigan, in the Eastern District of Michigan.

30.     In January 2021, Fiat Chrysler Automobiles N.V., a Dutch corporation headquartered in London, United Kingdom combined with Peugeot S.A. a French company headquartered in Paris, France to form Stellantis N.V., a Franco-Italian-American multinational automotive manufacturing corporation headquartered in Amsterdam, Netherlands.  FCA US LLC exists as a corporate entity in the United States under Stellantis N.V.  Stellantis N.V. generally

holds all assets of FCA and has successor liability for the claims at issue in this case.

31.     FCA (sometimes referred to as "Chrysler") is a motor vehicle "Manufacturer" and a licensed "Distributor" of new, previously untitled Jeep brand motor vehicles.  FCA's Chrysler brand is one of the "Big Three" American automobile brands.  FCA engages in commerce by distributing and selling new passenger cars and motor vehicles under its Jeep brand.  Other major divisions of FCA include Ram, Chrysler, Fiat, Mopar- its automotive parts and accessories division, and SRT- its performance automobile division.  As of 2015, FCA is the seventh largest automaker in the world by unit production.

32.     FCA's business operations in the United States include the manufacture, distribution, and sale of motor vehicles and parts through its network of independent, franchised motor vehicle dealers.  FCA is engaged in interstate commerce in that it sells vehicles through this network located in every state of the United States.

33.     FCA sells its vehicles through FCA franchise dealerships.  FCA distributes information, including window stickers and brochures, about the Class Vehicles to its dealers for the purpose of passing that information to consumers.  FCA also understands that its dealers pass on information from FCA about the characteristics, benefits, and quality of the Class Vehicles to consumers.  The dealers act as FCA's agents in selling the Class Vehicles and disseminating information about them to customers and potential customers.

### JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction pursuant to U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class and subclass are in excess of $5,000,000.00, exclusive of costs and interest, and Plaintiff, as well as most members of the proposed class and subclass, are citizens of states different from Defendant.  This Court also have supplemental jurisdiction over state law claims pursuant to 28

U.S.C § 1367.

35.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in and is headquartered in this District, regularly transacts substantial business in this District, is subject to personal jurisdiction in this District, and therefore is deemed to be a citizen of this District.  Additionally, FCA has advertised in this District and has received substantial revenue and profits from its sales and/or leasing of Class Vehicles in this District; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this District.

36.     This Court has general personal jurisdiction over Defendant because it is headquartered and has otherwise conducted substantial business in this District, and intentionally and purposefully placed Class Vehicles into the stream of commerce within Michigan and throughout the United States.

## CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action on her own behalf and on behalf the following classes:

    a.  All persons in the United States who purchased or leased a 2014-2020 Jeep Grand Cherokee equipped with an Electronic Parking Brake (the "Class"). Any judicial officer to whom the Action is assigned is excluded from the Class.

    b.  All Class members who reside in California (the "California Class" or the "Subclass").

38.     Subject to additional information obtained through discovery, the foregoing class definitions may be modified in an amended complaint or at class certification, including through the use of multi-state subclasses to account for material differences in state law, if any.

39.     At this time, Plaintiff does not know the exact number of members of the aforementioned Class ("Class Members") and Subclass.  However, Plaintiff alleges the Unintended Braking Defect affects approximately 1.3 million vehicles.  Therefore, Plaintiff

believes that Class and Subclass Members are so numerous that joinder of all members is impracticable.

40.     There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and facts common to members of the Class and Subclass predominate over questions that may affect individual Class and Subclass Members include:

a.   whether Defendant misrepresented and/or failed to disclose material facts concerning the Unintended Braking Defect;

b.   whether Defendant's conduct was unfair and/or deceptive;

c.   whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class and Subclass;

d.   whether Plaintiff and the Class and Subclass sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

e.   whether Defendant made express warranties to the Class and Subclass members; and

f.   whether Defendant made implied warranties to the Class and Subclass members.

41.     Plaintiff's claims are typical of those of the Class and Subclass because Plaintiff, like all members of the Class and Subclass, purchased and/or leased a Class Vehicle, and Plaintiff sustained damages from Defendant's wrongful conduct.

42.     Plaintiff is an adequate representative of the Class and Subclass because her

interests do not conflict with the interests of the Class and Subclass Members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of the Class and Subclass Members will be fairly and adequately protected by Plaintiff and her counsel.

43.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class and Subclass Members.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Express Warranty

44.     Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

45.     Plaintiff brings this claim on behalf of herself and the other members of the Class and Subclass.

46.     Defendant is and was at all relevant times merchants and sellers of motor vehicles as defined under the Uniform Commercial Code.  With respect to leases, FCA is and was at all relevant times a lessor of motor vehicles as defined under the Uniform Commercial Code.

47.     The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

48.     Defendant promised, warranted, and/or advertised that the Class Vehicles have the capability to safely drive through water up to 16 inches deep.  These warranties, as well as advertisements, brochures, and other statements in the media regarding the Class Vehicles formed a basis of the bargain that was reached when Plaintiff and Class members purchased or leased their Class Vehicles.

49.     Plaintiff and Class members experienced the existence of the Unintended Braking Defect within the warranty periods but had no knowledge of the existence of the defect, which was known and concealed by FCA.  Despite the existence of the warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles contained the Unintended Braking Defect.

50.     Plaintiff and Class members could not have reasonably discovered the Unintended Braking Defect prior to failure.  Due to the fact that the parts affected by the Unintended Braking Defect are internal, electrical components, and the failure manifests suddenly and without warning, Plaintiff and Class members have no warning that the Unintended Braking Defect has manifested until it causes the vehicle to suddenly brake.

51.     Because of the Unintended Braking Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of the Class Vehicles to perform the function of safe and reliable transportation.

52.     FCA breached its express warranties by selling and leasing Class Vehicles that were defective with respect to materials, workmanship or factory preparation.  In other words, even though the vehicles are warranted to be able to drive in the rain, the electronic parking brakes still fail in conditions much less extreme, such as those found on normal wet roads after a rainstorm.

53.     Even when FCA does repair the Unintended Braking Defect under warranty, the repair is ineffective.  That is because FCA's practice of replacing faulty electronic parking brake components with equally defective replacement parts leaves the electronic parking brake susceptible to repeated failure and thus does not effectively remedy the Unintended Braking Defect.

54.     The limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the remedy is insufficient to make Plaintiff and Class members whole because, on information and belief, FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

55.     Because of FCA's breach of express warranty as set forth herein, Plaintiff and Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

56.     As a direct and proximate result of FCA's breach of express warranties, Plaintiff and Class members have been damaged in an amount to be determined at trial.

**COUNT II**
**Breach of Implied Warranty**

57.     Plaintiff incorporates and realleges each preceding paragraph as though fully set

forth herein.

58.    Plaintiff brings this claim individually and on behalf of the other members of the Class and Subclass.

59.    Defendant marketed and placed the Class Vehicles into the stream of commerce with the intent they be purchased by Plaintiff and Class members.

60.    Defendant is a "merchant" for purposes of the Uniform Commercial Code because the company regularly sells consumer automobiles of this kind.

61.    The Class Vehicles were defective and not of merchantable quality when they left FCA's control because of the Unintended Braking Defect and their inability to withstand exposure to water during normal use.

62.    Plaintiff and Class members used their Class Vehicles for the ordinary purpose that consumer automobiles are used-to reliably, comfortably, and safely transport passengers and belongings for personal, family, or household purposes.  Despite Plaintiff's and Class members' ordinary and expected use of their vehicles, the Class Vehicles did not adhere to minimal consumer expectations, were not of fair and average quality, and would not pass without objection in the consumer automotive industry at the time of sale because of their inability to withstand exposure to water during normal use.

63.    Defendant has been given a reasonable opportunity to cure its breach of the implied warranty of merchantability and/or Plaintiff and Class members were not required to do so because such an opportunity would be futile.  FCA has known about the Unintended Braking Defect for years and has failed to repair or replace the Class Vehicles to a minimum standard of quality.

64.    Plaintiff and other Class Members who purchased or leased a Class Vehicle are

entitled to the benefit of their bargain: a vehicle with a nondefective electronic parking brake that does not fail to function when exposed to water during normal driving conditions.

65.     Any attempt by Defendant to disclaim or limit the implied warranty of merchantability vis-a-vis consumers is unconscionable and unenforceable here.  Specifically, Defendant's warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing consumers about the defect.  Further, a disclaimer of implied warranties is effective only if it is conspicuous and made available to the consumer prior to the sale of the product.  Any purported disclaimer here was not conspicuous and not made available to consumers prior to the sale of the product.

66.     As a direct and proximate result of Defendant's breach of implied warranty, Plaintiff and Class members have been damaged in an amount to be determined at trial.

## COUNT III
### Unjust Enrichment

67.     Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

68.     Plaintiff brings this claim individually and on behalf of the other members of the Class and Subclass.

69.     Plaintiff and the other members of the Class conferred a benefit on Defendant by leasing or purchasing the Class Vehicles.  Defendant was and should have been reasonably expected to provide Class Vehicles free from the Defect.

70.     Defendant unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of their false representations, omissions and concealment of the Defect in the Class Vehicles.

71.     As a proximate result of Defendant's false representations, omissions and

concealment of the Defect in the Class Vehicles, and as a result of Defendant's ill-gotten gains, benefits and profits, Defendant has been unjustly enriched at the expense of Plaintiff and the other members of the Class. It would be inequitable for Defendant to retain its ill-gotten profits without paying the value thereof to Plaintiff and the other members of the Class.

72.     There is a direct relationship between Defendant on the one hand, and Plaintiff and the other class members on the other, sufficient to support a claim for unjust enrichment. Defendant failed to disclose the Defect to improve retail sales, which in turn improved wholesale sales.   Conversely, Defendant knew that disclosure of the Defect would suppress retail and wholesale sales of the Class Vehicles, suppress leasing of the Class Vehicles, and would negatively impact the reputation of Defendant's brand among Plaintiff and the other Class members.  Defendant also knew their concealment and suppression of the Defect would discourage Plaintiff and the other Class members from seeking replacement or repair concerning the Defect, thereby increasing profits and/or avoiding the cost of such replacement or repairs.

73.     Plaintiff and members of the putative class lack an adequate remedy at law with respect to this claim and are entitled to non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

### COUNT IV
**Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.**

74.     Plaintiff hereby incorporates and realleges each preceding paragraph as though fully set forth herein.

75.     Plaintiff Areias brings this cause of action on behalf of herself and the other members of the California Class against FCA.

76.     California Business & Professions Code Section 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair,

deceptive, untrue or misleading advertising."

77.     FCA knew that the Class Vehicles suffered from an Unintended Braking Defect, were defectively designed and/or manufactured, would fail prematurely, and were not suitable for their intended use.

78.     In failing to disclose the Unintended Braking Defect, FCA knowingly and intentionally concealed material facts and breached its duty to disclose, thereby engaging in a fraudulent business act or practice within the meaning of the UCL.

79.     FCA was under a duty to Plaintiff and the other members of the California Class to disclose the Unintended Braking Defect because: a) FCA was in a superior position to know the true state of facts about the safety defect in the Class Vehicles; b) FCA made partial disclosures about the Class Vehicles without revealing the Unintended Braking Defect; and c) FCA actively concealed the Unintended Braking Defect from Plaintiff and the other Class members at the time of sale and thereafter.

80.     The facts concealed or not disclosed by FCA are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease the Class Vehicles, or to pay less for them. Had Plaintiff and the Class members known about the Unintended Braking Defect at the time of purchase, they would not have purchased or leased the Class Vehicles or would have paid less for them.

81.     FCA's omissions of material facts, as set forth herein, also constitute "unfair" business acts and practices within the meaning of the UCL, in that FCA's conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous. Plaintiff also asserts a violation of public policy arising from FCA's withholding of material safety facts from consumers. FCA's violation of consumer protection and unfair competition laws resulted in

harm to consumers.

82.     FCA's omissions of material facts, as well as its post-sale refusal to remedy the

Unintended Braking Defect or pay for necessary repairs, also constitute unlawful business acts or

practices because they violate consumer protection laws and the common law as set forth herein.

83.     FCA's omissions of material facts, as well as its post-sale refusal to remedy the

Unintended Braking Defect or pay for necessary repairs, also constitute "unfair" conduct under

the UCL, because FCA's conduct is immoral, unethical, oppressive, unscrupulous or

substantially injurious to consumers.  There is no utility to FCA's conduct; or alternatively, any

such utility is outweighed by the gravity of harm to Plaintiff and to the Subclass members.

Furthermore, the consumer injury is substantial; (2) the injury is not outweighed by any

countervailing benefits to consumers or competition; and (3) the injury is one that consumers

could not have reasonably avoided.

84.     FCA knowingly sold Class Vehicles with unreliable and defective Electronic

Parking Brake system.  FCA knew that Plaintiff and Subclass members would suffer financial

harm as a result of the Unintended Braking Defect in the form of repair costs and diminution in

value to their Class Vehicles, and in fact Plaintiff and class members have suffered such financial

harm.

85.     FCA's unfair or deceptive acts or practices occurred repeatedly in FCA's trade or

business, and were capable of deceiving a substantial portion of the purchasing public.

86.     As a direct and proximate result of FCA's unfair and deceptive practices, Plaintiff

and the other members of the Subclass have suffered and will continue to suffer out-of-pocket

losses.

87.     Plaintiff and the members of the Class have suffered an injury in fact resulting in

the loss of money and/or property as a proximate result of the violations of law and wrongful conduct of Defendant alleged herein, and they lack an adequate remedy at law to address the unfair conduct at issue here.  Legal remedies available to Plaintiffs and class members are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief.  Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages.  Hence, the Court may award restitution even if it determines that Plaintiffs fail to sufficiently adduce evidence to support an award of damages.  Damages and restitution are not the same amount.  Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest.  Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize.  Legal claims for damages are not equally certain as restitution because claims under the UCL entail few elements.  In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law

88.    In connection with their UCL claim, Plaintiff and the California Class members seek restitution, disgorgement, injunctive relief, and any other relief available under the statute.

## COUNT V
**Violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.**

89.    Plaintiff hereby incorporates and realleges each preceding paragraph as though fully set forth herein.

90.    Plaintiff Areias brings this claim on behalf of herself and the other members of the California Class against FCA.

91.    FCA is a "person" as defined by California Civil Code § 1761(c).

92.    Plaintiff Areias and the other California Class members are "consumers" within

the meaning of California Civil Code § 1761(d).

93.     By failing to disclose and concealing the Unintended Braking Defect, FCA violated California Civil Code § 1770(a), as it represented that the Class Vehicles had characteristics and benefits that they do not have, represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another, and advertised the Class Vehicles with the intent not to sell them as advertised.  *See* Cal. Civ. Code §§ 1770(a)(5), (7) & (9).

94.     FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

95.     FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

96.     FCA was under a duty to Plaintiff and the other members of the California Class to disclose the defective nature of the Class Vehicles' Electronic Parking Brake system and/or the associated repair costs because: a) FCA was in a superior position to know the true state of facts about Unintended Braking Defect; b) Plaintiff and the Subclass members could not reasonably have been expected to learn or discover that their Class Vehicles have a dangerous safety defect until after they purchased the Class Vehicles; and c) FCA knew that Plaintiff and the other Subclass members could not reasonably have been expected to learn about or discover the Unintended Braking Defect.

97.     By failing to disclose the Unintended Braking Defect, FCA knowingly and intentionally concealed material facts and breached its duty not to do so.

98.     The facts concealed or not disclosed by FCA are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.  Had Plaintiff and the other Subclass members known about the Unintended Braking Defect at the time of purchase, they would not have purchased the Class Vehicles or would have paid less for them.

99.     As a result of FCA's misconduct, Plaintiff and other Subclass members have suffered monetary harm in that the Class Vehicles are defective and require repairs or replacement.

100.     As a direct and proximate result of FCA's unfair or deceptive acts or practices, Plaintiff and the other California Class members have suffered and will continue to suffer losses.

101.     In connection with their CLRA claim, the Plaintiff Areias and the Subclass members seek restitution, injunctive relief, and attorneys' fees and costs.

<u>**COUNT VI**</u>
**Violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, *et seq.***

102.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

103.     Plaintiff brings this claim individually and on behalf of California Class against Defendant.

104.     Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive Subclass Members and the public.  As described above, and throughout this Complaint, Defendant misrepresented the Class Vehicles as being safe for the road, and the EPB as a "convenient safety feature."

105.     By its actions, Defendant disseminated uniform advertising regarding the Class Vehicles to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.  Such

advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

106.    The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the Class Vehicles have an Unintended Braking Defect.

107.    Defendant continues to misrepresent to consumers that the Class Vehicles are safe for the road.  However, as described above, that is not the case.

108.    In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Plaintiff and other Subclass Members based their purchasing decisions on Defendant's omitted material facts.  The revenue attributable to the Class Vehicles sold in those false and misleading advertisements likely amounts to tens of millions of dollars.  Plaintiff and Subclass Members were injured in fact and lost money and property as a result.

109.    The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

110.    As a result of Defendant's wrongful conduct, Plaintiff and Subclass Members lost money in an amount to be proven at trial.  Plaintiff and Subclass Members are therefore entitled to restitution as appropriate for this cause of action.

111.    Plaintiff and Subclass Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under

California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

112.    Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law, if, for instance damages resulting from her purchase of the Class Vehicles is determined to be an amount less than the premium price of the Class Vehicles.  Without compensation for the full premium price of the Class Vehicles, Plaintiff would be left without the parity in purchasing power to which she is entitled.

113.    Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Class Vehicles so that Plaintiff and Subclass members can reasonably rely on Defendant's representations as well of those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

<u>COUNT VII</u>
**Breach of the Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792, *et seq*.; and California Commercial Code § 2314**

114.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

115.    Plaintiff brings this claim individually and on behalf of the California Class against Defendant.

116.    Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular

purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

117. The Class Vehicles at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

118. Plaintiff and the Subclass Members who purchased the Class Vehicles are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

119. Defendant is in the business of manufacturing, assembling, and/or producing the Product and/or selling the Product to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

120. By representing that the Class Vehicles had Electronic Parking Brakes – a "convenient safety feature" – Defendant impliedly warranted to consumers that the Class Vehicles were merchantable, such that they were of the same average grade, quality, and value as similar goods sold under similar circumstances. For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Defendant breached these implied warranties because the Class Vehicles had a defective EPB. Therefore, the Class Vehicles would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

121. Plaintiff and Subclass Members purchased the Class Vehicles in reliance upon Defendant's skill and judgment in properly designing, manufacturing, advertising, and selling the Class Vehicles.

122. The Class Vehicles were not altered by Plaintiff or the Subclass Members.

123. The Class Vehicles were defective at the time of sale when they were in the exclusive control of Defendant. The issue as described in this complaint was latent in the product and not reasonably discoverable at the time of sale.

124. Defendant knew that the Class Vehicles would be purchased and consumed without additional testing by Plaintiff and Subclass Members.

125. As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Class Vehicles if they knew the truth about the Class Vehicles, namely, that they were unfit for use and posed a significant safety risk.

126. Plaintiff and the Subclass seek compensatory damages, attorneys' fees, costs, and any other just and proper relief available under law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order certifying the Class and Subclass under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel;

b. For an order declaring Defendant's conduct violates the law referenced herein;

c. For an order finding in favor of Plaintiff and the Class and Subclass on the counts asserted herein;

d. For prejudgment interest on all amounts awarded;

e. For an award of restitution, non-restitutionary disgorgement, actual damages, and punitive damages;

f. For injunctive relief as pleaded or as the Court may deem proper; and

g. For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  October 14, 2022

Respectfully Submitted,

By:___*/s/ Nick Suciu III*___
          Nick Suciu III

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
Nick Suciu III (P72052)
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Telephone: (313) 303-3472
Email: nsuciu@milberg.com

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
Gary M. Klinger
227 Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
gklinger@milberg.com

**BURSOR & FISHER, P.A.**
Frederick J. Klorczyk III
Alec M. Leslie
888 Seventh Avenue
New York, NY  10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email:  fklorczyk@bursor.com
             aleslie@bursor.com

**BURSOR & FISHER, P.A.**
Joel D. Smith
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email:  jsmith@bursor.com

*Attorneys for Plaintiff*

27